**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **CELTIC BANK CORP.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 1:13-cv-0040** |
| | § | |
| **TONY L. JACOBS, JR., and** | § | |
| **JACOBS STONE PRODS., INC.** | § | |
| | § | |
| **Defendants.** | § | |

## ORIGINAL COMPLAINT

Plaintiff Celtic Bank purchased a stone quarry and a stone processing facility through a foreclosure auction held December 4, 2012.  Defendants know Celtic Bank purchased the property in a foreclosure sale.  But this has not stopped them from mining, removing, processing and selling tons of stone (literally) from Celtic Bank's quarry, and pocketing the proceeds from the sale of such stone.  Celtic Bank therefore files this action to try title to the stone quarry and processing facility, to enjoin Defendants' unauthorized entry onto Celtic Bank's land and their unauthorized use of Celtic Bank's equipment, and to recover for Defendants' unauthorized taking of Celtic Bank's stone.

### I.  PARTIES

1.    Celtic Bank is a Utah corporation with its principal place of business in Utah.

2.      Tony Jacobs, Jr. is an individual who can be served with process at his residence located at 504 W Pierce, San Saba, Texas 76877; or at 1210 W Pierce St., San Saba, Texas 76877; or wherever he may be found.

3.      Jacobs Stone Products, Inc. ("JSPI") is a Texas corporation with its principal place of business in Texas.  JSPI may be served with process through its registered agent, Tony Jacobs, Jr., at 1210 W Pierce St., San Saba, Texas 76877, or wherever Jacobs may be found.

## II.  JURISDICTION AND VENUE

4.      The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.  Celtic Bank is a Utah citizen under § 1332(c) because it is a Utah corporation with its principal place of business in Utah.  The defendants are both Texas citizens.  Jacobs is a Texas citizen because he is domiciled in Texas—that is, he both resides and intends to remain in Texas.   Under § 1332(c), JSPI is also a Texas citizen because it is a Texas corporation with its principal place of business in Texas.   The amount in controversy exceeds $75,000 because the object of the litigation—the Quarry—is worth well more than $75,000.   Moreover, as shown below, Celtic Bank seeks recovery of more than $75,000 in damages.

5.      The Court has personal jurisdiction over the Defendants because they are both Texas residents and do business in Texas.

6.      Venue is proper in this district because both Defendants reside in this district, and the real property at issue is located in this district.

### III.  FACTS COMMON TO ALL CLAIMS

7.     Jacobs & Son Enterprises, Inc. operated a stone quarry business in San Saba and Williamson counties for many years.  The business included a 150-acre stone quarry ("the Quarry"), along with a 7.67-acre stone processing facility, located in San Saba County.

8.     For much of this time, Jacobs & Son's principal shareholders—Tony Jacobs (Sr.) and Janie Jacobs—personally participated in Jacobs & Son's daily management.  Eventually, however, Mr. and Mrs. Jacobs' son, defendant Tony Jacobs, Jr., took over management of the Quarry and processing facility  for Jacobs & Son, while Mr. and Mrs. Jacobs managed a retail business associated with the Quarry.

9.     By the end of 2008, Jacobs & Son needed significant capital to invest in equipment and inventory purchases.  So Jacobs & Son applied, and was later approved, for a small business loan from plaintiff Celtic Bank in the amount of $1,726,000.

10.     The parties consummated the loan on March 27, 2009.  On that date Jacobs & Son executed a Note in Celtic Bank's favor.  A true and correct copy of the Note is attached as Exhibit 1.

11.     In the Note, Jacobs & Son agreed to provide "Collateral . . . as security for payment of th[e] Note or any guarantee of this Note," and further agreed that, in the event of default, Celtic Bank could take possession of or sell any Collateral.  *See* Ex. 1, Note at 1–2.

12.     Celtic Bank agreed to make the loan to Jacobs & Son only after its officers, including Tony Sr. and Janie Jacobs, signed personal guarantees.  True and correct copies of the guarantees are attached as Exhibit 2.  Under the guarantees, Tony Sr. and Janie Jacobs ("the guarantors") each personally guaranteed that Jacobs & Son would repay the Note in full.

13.     Each guarantor expressly agreed in the Commercial Guarantees that Celtic Bank could "[f]oreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale," in the event of default.  *Id*. at 2.

14.     To secure Jacobs & Son's and the guarantors' obligations under the Note and Commercial Guarantees, Celtic Bank required Jacobs & Son and the guarantors to each execute a deed of trust.

15.     A copy of the Deed of Trust was recorded in Williamson County on April 2, 2009, and in San Saba County on April 3, 2009.  True and correct copies of each Deed of Trust are attached as Exhibits 3 and 4.

16.     Under the Deed of Trust, Jacobs & Son and the guarantors pledged both "Real Property" and "Personal Property" as collateral for the Jacobs & Son loan, referred to collectively as "the Property."  *See, e.g.*, Ex. 3, Deed of Trust. at 1, 10.

17.     The Real Property that Jacobs & Son and the guarantors pledged consisted of three tracts: Tract 1 was a retail facility located in Williamson County (1408 N. Bell Blvd., Cedar Park, Texas); Tract 2 was the Quarry; and Tract 3 was the processing facility (located at 1201 W. Pierce St., San Saba, TX).  *See id*. at 1.

18.     Jacobs & Son owned both Tracts 1 and 3 at the time it executed the Deed of Trust, while the guarantors, Tony Sr. and Janie Jacobs, owned Tract 2 at the time they executed the Deed of Trust in their individual capacities.

19.     In addition to pledging the Real Property, Jacobs & Son and the guarantors expressly pledged as collateral their interests "in the Personal Property and Rents." *Id*. at 1.

20.     The Deed of Trust defined "Personal Property" as "all equipment, fixtures, and other articles of personal property now or hereafter owned by [Jacobs & Son and the guarantors], and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property." *Id*. at 10.

21.     Under a Commercial Security Agreement that Jacobs & Son also executed, the "Personal Property" referred to in the Deed of Trust included "all inventory, chattel paper, accounts, equipment and general intangibles." A true and correct copy of the Commercial Security Agreement is attached as Exhibit 5. Celtic Bank further recorded its interest in the Personal Property with a UCC Financing Statement, which is attached as Exhibit 6.

22.     Because Jacobs & Son and the guarantors all pledged Rents as collateral, each recorded Deed of Trust included an Assignment of Rents, which made any unapproved assignment of rents, such as leasing the Property to a tenant,

an Event of Default.  "Rents" referred to "all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property." *See, e.g.*, Ex. 3, Deed of Trust at 10.

23.    About two months after Celtic Bank made its loan, the parties subsequently modified the loan terms.  The parties agreed to increase the loan amount from $1,726,000 to $2,000,000, and to defer payments for three months.  A Modification Agreement and a Modified Deed of Trust were therefore executed and recorded on May 10, 2009.

24.    After Celtic Bank recorded its Deed of Trust, Defendant Jacobs recorded in San Saba County a "Notice of Lease of Real Property Conveying Interests in and to Tony L. Jacobs, Jr."

25.    According to the Notice of Lease, Jacobs had entered a lease for the Quarry from the guarantors, Tony Jacobs Sr. and Janie Jacobs.  At no point, however, did the guarantors ever seek Celtic Bank's approval, or notify Celtic Bank of their intention to execute the lease with Jacobs.  And at no point did Celtic Bank approve of or consent to Jacobs's leasing the Quarry.

26.    Moreover, at no point prior to or during the origination process did Jacobs & Son or the guarantors notify Celtic Bank that Defendants had executed a lease with either Defendant.

27.    Although the Notice of Lease purports to be executed on April 1, 2009, the Notice of Lease was not notarized until May 12, 2009, and then was not recorded in San Saba County until June 23, 2009—almost ninety days after Celtic

Bank recorded its interest in the Quarry and processing facility through the Deed of Trust.  A certified copy of the Notice of Lease is attached as Exhibit 7.

28.     Within a few years of obtaining the loan, Jacobs & Son—and the guarantors—defaulted on their obligations under the Note and Deed of Trust.

29.     Celtic Bank therefore foreclosed on its Deed of Trust on December 4, 2012, after posting and serving all required notices.

30.     At the public foreclosure auction, Celtic Bank purchased the Real Property, including the Quarry and the processing facility, after submitting the highest bid.

31.     The foreclosure trustee then issued Celtic Bank a sale deed, which "granted, sold, and conveyed all of the [the Real Property] to [Celtic Bank] and [its] heirs and assigns, . . . together with the rights, privileges, and appurtenances thereto belonging unto [Celtic Bank] and [its] heirs and assigns forever."  True and correct copies of the foreclosure sale deeds recorded in San Saba and Williamson counties are attached as Exhibit 8.

32.     Given Jacobs's management of the Quarry for Jacobs & Son, and his close association with Jacobs & Son (his parents' business), Jacobs and JSPI knew of the foreclosure auction, and of Celtic Bank's purchase of the Quarry and processing facility at that auction.  Yet, Jacobs and JSPI have continued to occupy the Quarry and processing facility, and to treat the Quarry and processing facility as their own, claiming their right to continue operations under the lease that was

extinguished by Celtic Bank's foreclosure on the defaulting guarantors, Jacobs's parents.

33.     Since the date of Celtic Bank's purchase of the property, Jacobs and JSPI have continuously mined Celtic Bank's stone out of the Quarry, and have processed, marketed, and sold a significant quantity of Celtic Bank's stone to unknown third parties.

34.     To make matters worse, Jacobs and JSPI are using Celtic Bank's equipment and processing facility to conduct their unauthorized operations.

35.     Celtic Bank has a potential buyer for the Quarry.  But Jacobs and JSPI's continued presence and activities on the property are frustrating that potential sale, and rapidly diminishing the Quarry's value.

36.     Moreover, recently taken aerial photographs show that Jacobs and JSPI are further impairing the Quarry's value by depositing large amounts of stone waste on the Quarry.

37.     Although Defendants tendered a rent check of $3,500 to Celtic Bank, Celtic Bank rejected the check and returned it to Defendants.

38.     Celtic   Bank   instead   hand   delivered   a   notice   to   vacate   on January 11, 2013.   Under the Deed of Trust, Celtic Bank as purchaser of the property had the right to demand that Defendants vacate the property immediately upon such demand, and any refusal or failure to vacate entitled Celtic Bank to file an action for forcible detainer.  *See, e.g.*, Ex. 3, Deed of Trust at 7.  Celtic Bank

therefore demanded that Defendants vacate the Quarry and processing facility, and cease using any of Celtic Bank's Real or Personal Property.

39.    However, notwithstanding Celtic Bank's demand, Defendants continued removing stone from the Quarry, processing and selling stone at Celtic Bank's processing facility, and selling such stone to third parties.

40.    Celtic Bank therefore files this action to secure its Real and Personal Property, to obtain clear title to and possession of the Quarry and the processing facility, and to prevent Jacobs and JSPI from removing and selling any more of Celtic Bank's stone or using any of Celtic Bank's equipment.

## IV.  CAUSES OF ACTION

### COUNT I: TRESPASS TO TRY TITLE

41.    Plaintiff Celtic Bank seeks to try its title to the Quarry and the processing facility against Tony Jacobs, Jr. and Jacobs Stone Products, Inc.'s claim to possession of the Quarry under the lease they obtained from Jacobs & Son.

42.    To obtain a loan from Celtic Bank, Jacobs & Son and the guarantors (Tony Jacobs Sr. and Janie Jacobs) pledged as collateral their respective interests in the Quarry and processing facility in the Deed of Trust, which was recorded in San Saba County on April 3, 2009.

43.    The Quarry is listed as "Tract 2" in the Deed of Trust, and is located in San Saba County.  The Quarry's legal description is included within the Deed of Trust attached as Exhibit 4, and is here incorporated as if set forth in its entirety.

44.    The guarantors owned Tract 2 at the time they personally executed the Deed of Trust.

45.    The processing facility is listed as "Tract 3" under the Deed of Trust, and is also located in San Saba County.  The legal description of Tract 3 is included within the Deed of Trust attached as Exhibit 4, and is here incorporated as if set forth in its entirety.

46.    Jacobs & Son owned Tract 3 as of the date it executed the Deed of Trust.

47.    Celtic Bank extinguished Jacobs & Son's and the guarantors' interest in the Quarry and the processing facility by foreclosing on the Deed of Trust on December 4, 2012.

48.    The foreclosure also extinguished any interest Defendants may have obtained from Jacobs & Son or the guarantors in either the Quarry or the processing facility under the lease they purportedly obtained from the guarantors.

49.    Accordingly, when Celtic Bank submitted the highest bid at the foreclosure auction, Celtic Bank purchased the Quarry and the processing facility free and clear of any other claims.

50.    The substitute trustee therefore issued to Celtic Bank a deed that conveyed an undivided, fee-simple interest in the Quarry and the processing facility from Jacobs & Son and the guarantors to Celtic Bank.

51.    Celtic Bank is therefore entitled to full possession of the Quarry, notwithstanding the Notice of Lease that Jacobs and JSPI recorded *after* Celtic

Bank recorded its Deed of Trust and *before* Celtic Bank foreclosed on its Deed of Trust.

52.     Since the date Celtic Bank obtained title to the Quarry and the processing facility, however, Jacobs and the employees of JSPI have continuously and unlawfully entered and possessed the Quarry and the processing facility, and have mined, processed, and sold stone—Celtic Bank's stone—from the Quarry. Defendants have retained all profits from the sale of such stone, and still deprive Celtic Bank of the full, unfettered possession of the Quarry and processing facility.

53.     Moreover, Defendants' actions diminished, and will continue to diminish, the Quarry's and the processing facility's value and marketability.

54.     Celtic Bank therefore seeks a judgment that Celtic has sole title to, and is entitled to full and unfettered possession of, the Quarry and processing facility, and that neither Jacobs nor JSPI have retained any interest in, or a right to the possession of, any part of the Quarry or processing facility.

55.     Celtic Bank also seeks a preliminary and permanent injunction to prevent Defendants from entering the Quarry or the processing facility, removing any stone from the Quarry or processing facility, selling any stone mined from the Quarry since December 4, 2012, or disposing of any profits made or any receivables obtained from any stone mined on December 4, 2012 or later.

56.     Celtic Bank also seeks to recover actual damages resulting from Defendants' conduct, including damages for the diminished value of the Quarry and

processing facility, and damages caused by Defendants' unlawful entry and use of Celtic Bank's land.

57.   Celtic Bank also seeks disgorgement of any profits Defendants have obtained through their sale of stone mined from Celtic Bank's quarry.

58.   Celtic Bank also seeks exemplary damages because Defendants' unlawful entry onto Celtic Bank's property was motivated by malice.   Given Jacobs's management of the Quarry for Jacobs & Son, and his close association with Jacobs & Son, Defendants know that Celtic Bank purchased the property through the foreclosure sale in December of 2012.   Yet, notwithstanding this knowledge, they have continually entered the Quarry, asserting that a lease extinguished by the foreclosure sale gives them the right to do so.   Indeed, Defendants continued entering the Quarry and removing stone even after Celtic Bank's January 11, 2013, Notice to Vacate.

59.   Celtic Bank also seeks pre- and post-judgment interest for all amounts recovered under this count.

## COUNT II: FORCIBLE DETAINER

60.   Celtic Bank's lien, as established by its Deed of Trust against the Quarry and the processing facility, was superior to Defendants' lease interest in such real property because Celtic Bank's lien was executed prior to, and without notice of, the Defendants' lease, and was recorded before Defendant's lease was recorded.

61.     Celtic Bank's foreclosure of the Deed of Trust therefore terminated Defendants' lease interest on the Quarry and processing facility.

62.     Accordingly, in the wake of Celtic Bank's foreclosure sale and purchase of the Quarry and processing facility, defendants Jacobs and JSPI are tenants at sufferance because their possession and occupation of the property is wrongful.

63.     Although Celtic Bank hand-delivered to Defendants a notice to vacate all of Celtic Bank's Real Property on January 11, 2013, Defendants remain in possession of such property, however.

64.     Celtic Bank is therefore entitled to a judgment that Celtic Bank is entitled to possession of the Quarry and the processing facility.

## COUNT III: TRESPASS TO REAL PROPERTY

65.     Celtic Bank owned and is entitled to possess the Quarry and the processing facility by virtue of the deed it obtained at the foreclosure sale from Jacobs & Son and the guarantors.

66.     Since the date of the foreclosure sale and the date it received Celtic Bank's notice to vacate, Jacobs and JSPI's employees have continuously, voluntarily, and intentionally entered Celtic Bank's Quarry and processing facility to conduct JSPI's business.  Indeed, Defendants have taken physical possession of Celtic Bank's premises and the stone located on the Quarry.

67.     Jacobs and JSPI know, however, that Celtic Bank owns the Quarry and processing facility, and has since December 4, 2012.

68.    Defendants' trespass has caused significant injury to Celtic Bank's right of possession.  Defendants have removed, and are removing, literally tons of stone from the Quarry, which has significantly diminished the Quarry's value. Defendants' are also using the processing facility to process any stone they have mined, and are interfering with Celtic Bank's use and possession of the facility. Defendants' sale of the stone they mined from the Quarry has deprived Celtic Bank of expected profits from its use of the land and the value of the stone.

69.    Defendants' entry and use of Celtic Bank's Real Property invades Celtic Bank's right to possession of the Quarry.  Defendants' conduct also destroys Celtic Bank's use and enjoyment of the land as evidenced by Celtic Bank's inability to sell the property to a willing buyer because of Defendants' conduct and possession.   Accordingly, Celtic Bank also seeks a preliminary and permanent injunction to prevent Defendants from entering the Quarry and processing facility, removing any stone from the Quarry or processing facility, selling any stone mined from the Quarry since December 4, 2012, or disposing of any profits made or any receivables obtained from stone mined on December 4, 2012 or later.

70.    Celtic Bank also seeks exemplary damages for Defendants' trespass because Defendants acted with malice in entering Celtic Bank's Real Property: although Defendants knew that Celtic Bank owned the Quarry and processing facility since December 4, 2012, Defendants have continually entered the property without authorization, removed and sold Celtic Bank's stone, and conducted their quarry business on Celtic Bank's property.

71.     Celtic Bank also seeks pre- and post-judgment interest for all amounts recovered under this count.

## COUNT IV:  TRESPASS TO PERSONAL PROPERTY

72.     By virtue of the December 4, 2012, foreclosure sale, Celtic Bank owns the Personal Property located within the Quarry and the processing facility that was pledged in the Deed of Trust, including any equipment used to mine, haul, process, and store the stone mined from the Quarry.

73.     Jacobs and JSPI's employees are using and detaining Celtic Bank's equipment as they use the equipment to conduct JSPI's quarry business.

74.     Defendants' trespass has caused significant injury to Celtic Bank's right to possess the equipment.  Defendants' unauthorized use of Celtic Bank's equipment diminishes the equipment's value, and impairs Celtic Bank's use and enjoyment of such equipment, including its sale.

75.     Celtic Bank therefore seeks all actual damages resulting from Defendants' unauthorized use of Celtic Bank's equipment.

76.     By using Celtic Bank's equipment without right or authorization, Defendants have invaded Celtic Bank's right to possess the equipment.  Defendants' conduct also destroys Celtic Bank's use and enjoyment of the equipment, such as Celtic Bank's ability to sell the equipment to a willing buyer.  Celtic Bank therefore seeks a preliminary and permanent injunction to prevent Defendants from using, possessing, or exercising dominion over Celtic Bank's equipment or Personal Property.

77.     Celtic Bank also seeks exemplary damages for Defendants' trespass because Defendants acted with malice in taking possession of and using Celtic Bank's equipment.   Although Defendants knew that Celtic Bank owned the equipment, Defendants continually used the equipment without authorization to mine, remove, haul, and sell Celtic Bank's stone.   Indeed, Defendants continued using Celtic Bank's equipment and Personal Property even after receiving Celtic Bank's demand that they stop doing so.

78.     Celtic Bank also seeks pre- and post-judgment interest for all amounts recovered under this count.

## COUNT V: CONVERSION

79.     Celtic Bank owns the Personal Property that Jacobs & Son and the grantors pledged under the Deed of Trust.

80.     This Personal Property includes equipment located at the Quarry and the processing facility that is used to mine, haul, process, and store the stone mined from the Quarry.

81.     Celtic Bank also owns all stone mined from the Quarry since December 4, 2012.

82.     The equipment and the mined stone are personal property.

83.     Jacobs and JSPI, through its employees, have wrongfully exercised dominion and control over Celtic Bank's equipment and stone.   Since the date of the foreclosure, Defendants have taken possession of Celtic Bank's equipment, and continuously used such equipment to mine, haul, process, and store the stone they

obtained from the Quarry.  Defendants have also sold the stone they have mined from the Quarry to third parties.

84.   Defendants' unauthorized conduct has caused Celtic Bank significant injury, including lost profits resulting from the unauthorized sale of Celtic Bank's stone, diminished market value of the equipment they keep using, and travel expenses incurred to inspect the converted property.  Celtic Bank therefore seeks the recovery of actual damages resulting from Defendants' unauthorized conduct.

85.   Celtic Bank also seeks a preliminary and permanent injunction to prevent Defendants from entering the Quarry, using or exercising dominion over Celtic Bank's equipment, removing any stone from the Quarry, selling any stone mined from the Quarry since December 4, 2012, or disposing of any profits made or any receivables obtained from stone mined on December 4, 2012 or later.

86.   Celtic Bank also seeks exemplary damages for Defendants' conduct because their conversion of Celtic Bank's property was malicious.  Defendants know that they have no title or claim to any of the equipment they have seized or any of the stone they have mined and sold because of Celtic Bank's foreclosure and subsequent purchase of the Quarry.  Yet, they continue to use the equipment and sell Celtic Bank's stone, regardless of Celtic Bank's rights to such property.

87.   Celtic Bank also seeks pre- and post-judgment interest for all amounts recovered under this count.

## COUNT VI:  MONEY HAD AND RECEIVED

88.    Defendants hold money that in equity and good conscience belongs to Celtic Bank.

89.    Despite Celtic Bank's ownership of the Quarry, Defendants have continuously mined and sold stone from the Quarry.

90.    Celtic Bank is therefore entitled to the proceeds of those sales.

91.    Celtic Bank also seeks pre- and post-judgment interest for all amounts recovered under this count.

## PRAYER

92.    Wherefore, premises considered, Celtic Bank prays that the Court grant Celtic Bank the following relief:

    a.    Judgment against Defendants for Celtic Bank's actual, compensatory, consequential, and statutory damages;

    b.    Judgment against Defendants for exemplary damages;

    c.    A preliminary and permanent injunction enjoining Defendants from each of the following: (1) entering the Quarry or processing facility without authorization from Celtic Bank; (2) mining or removing any stone from the Quarry; (3) processing or selling any stone mined from the Quarry since December 4, 2012; (4) disposing of any profits made or any receivables obtained from the stone Defendants mined on December 4, 2012 or later; (5) using or exercising dominion over Celtic Bank's Personal Property; (6) using, possessing, or exercising dominion over any of Celtic Bank's Real or Personal Property; and (7) removing or destroying any documents relating to Celtic Bank's Real or Personal Property or Defendants' operation of the Quarry.

    d.    Pre-judgment and post-judgment interest at the highest rates allowed by law;

    e.    Taxable costs of court; and

f.    All other relief to which Celtic Bank may be entitled in law or at equity.

Date: _January 15, 2013_____                    Respectfully submitted,


                                           _/s/ *Joshua J. Bennett*_____
                                           E. Leon Carter
                                           State Bar No. 03914300
                                           lcarter@carterstafford.com
                                           Joshua J. Bennett
                                           Texas State Bar No. 24059444
                                           jbennett@carterstafford.com
                                           CARTER STAFFORD ARNETT
                                           HAMADA & MOCKLER, PLLC
                                           8150 N. Central Expy., Ste. 1950
                                           Dallas, Texas 75206
                                           214-550-8188- Telephone
                                           214-550-8185 - Facsimile

                                           **COUNSEL FOR PLAINTIFF**